**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Kittery Point Partners, LLC,<br><br>Debtor | Chapter 11<br>Case No. 17-20316 |
| Kittery Point Partners, LLC,<br><br>Plaintiff<br>v.<br><br>Bayview Loan Servicing LLC<br>& Todd Enright,<br><br>Defendants | Adv. Proc. No. 17-2065 |

**MEMORANDUM OF DECISION**

Since 2009, Kittery Point Partners has believed that it was harmed by certain actions of

Todd Enright and Bayview Loan Servicing.  In 2011, Kittery Point sued Bayview in state court.

Unhappy with the results of that litigation, Kittery Point started a chapter 11 case in June 2017

and then commenced this adversary proceeding against Bayview and Enright.  Both defendants

have moved for dismissal under Fed. R. Civ. P. 12(b)(6).  The defendants' motions will be

granted.

**I.      The Analytical Framework**

A pleading is subject to dismissal under Rule 12(b)(6) if it fails to state a claim upon

which relief may be granted.  In other words, a motion under Rule 12(b)(6) tests the sufficiency

of a pleading.  *See* Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013).  In

evaluating a Rule 12(b)(6) motion, the Court's work begins with the general rules of pleading,

which require "a short and plain statement of the claim showing that the pleader is entitled to

relief[.]" *See* Fed. R. Civ. P. 8(a)(2). There is no shortage of controlling precedent addressing the requirements of Rule 8 in the context of a motion to dismiss under Rule 12(b)(6). *See, e.g.*, Ashcroft v. Iqbal, 556 U.S. 662, 677-79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015). The case law clearly establishes the Court's charge. First, the Court must identify the factual allegations in the pleading and assume the truth of those allegations. A.G. ex. rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013). The same credence is not accorded to mechanistic recitals of the elements of a cause of action or to conclusions of law. Iqbal, 556 U.S. at 678-79; Elsevier, Inc., 732 F.3d at 80. Second, the Court must determine whether the sum of those factual allegations —plus all reasonable inferences that may be drawn in the claimant's favor—gives rise to a plausible claim. *See* Iqbal, 556 U.S. at 678; Cardigan Mountain Sch., 787 F.3d at 87. The pleading's factual allegations may be augmented with "data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

Probability of success is not the standard at this juncture, but the pleading must do more than raise a mere possibility of a successful claim. Iqbal, 556 U.S. at 678. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010). In assessing plausibility, the Court must generally decide whether the factual allegations, *in toto*, raise a reasonable expectation that discovery will reveal evidence of the elements essential to the claims. *See* Twombly, 550 U.S. at 556; Cardigan Mountain Sch., 787 F.3d at 88.

There are several exceptions to the general rules of pleading and to the corollary charge of holistic pleading construction, one of which is in play here.  *See* Twombly, 550 U.S. at 569 n.14 ("On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires.") (citing Fed. R. Civ. P. 9(b)-(c)).  A party alleging fraud may generally aver intent and other conditions of a person's mind, but "must state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).  To clear this heightened pleading standard, a complaint must specifically allege (a) that a particular false statement was made by a particular person, and (b) a basis for inferring the speaker's scienter.  N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009).  Stated differently, the pleader is expected to allege "the who, what, where, and when of the allegedly false or fraudulent misrepresentation [,]" Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and "specific facts that make it reasonable to believe that [the speaker] knew that a statement was materially false or misleading [,]" Cardinale, 567 F.3d at 13 (quotation marks omitted).

"A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief."  Jones v. Bock, 549 U.S. 199, 215 (2007).  Thus, dismissal under Rule 12(b)(6) "is appropriate if the complaint fails to set forth factual allegations . . . respecting each material element necessary to sustain recovery under some actionable legal theory."  Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quotation marks omitted).  Dismissal is also warranted if the allegations of the complaint show that relief is barred by an affirmative defense.  *See* Jones, 549 U.S. at 215.  For this showing to be made, the facts that establish the defense must be clearly ascertainable from the allegations of the complaint and any other documents that may be considered under Rule 12(b)(6), and those facts must "leave no

doubt" that the asserted defense bars the plaintiff's action.  Blackstone Realty LLC v. FDIC, 244

F.3d 193, 197 (1st Cir. 2001) (quotation marks omitted).

Before applying these principles to Kittery Point's complaint, a step back is warranted.

The forest should not be lost in the trees.  When Rule 12(b)(6) is invoked, the point of the

exercise is to identify disputes that should not be allowed to move to the discovery phase.

Litigation has, over the years, become increasingly complex, time-consuming, and expensive.

Rule 12(b)(6) motion practice should weed out claims that are futile, where discovery will not

unearth facts that would help the plaintiff succeed on the merits.  Determining whether a claim is

futile, in this sense, is "a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense."  Iqbal, 556 U.S. at 679.

## II.    The Well-Pleaded Factual Allegations

The following recitation is based primarily on the factual allegations in the complaint.[1]  It

is also premised upon certain judicially noticed facts.[2]  To the extent that allegations made in the

complaint are omitted from this recitation, those omitted allegations are conclusory, vague,

irrelevant, or some combination of those characteristics.  Those omitted allegations are not

entitled to a presumption of truth because they are not well-pleaded factual allegations.

---

[1]  References to the "complaint" are references to Kittery Point's amended complaint.  See Dkt. No. 4.

[2]  The process of distinguishing the allegations in that pleading that must be accepted as true was somewhat
complicated by the parties' motion papers.  In those papers, the parties asked the Court to take judicial notice of (a)
its own docket; (b) documents filed in the state court action between Kittery Point and Bayview; (c) certain
documents filed in Enright's chapter 7 case; and (d) a document entitled "Option Agreement" involving Windham
Real Estate Group, LLC and Crestone Needle, LLC.  Courts do not take judicial notice of documents: they take
judicial notice of adjudicative facts.  See Fed. R. Evid. 201.  Nevertheless, the parties' requests for judicial notice
were granted without objection at a hearing.  Despite its grant of those requests, the Court has not considered all of
those documents.  The Option Agreement is not incorporated by reference into the complaint, and it is unnecessary
to consult most of the documents in Enright's chapter 7 case.  Of the items filed in the state court action, Kittery
Point's complaint and the Superior Court Order (defined below) are the only relevant documents incorporated into
the complaint.  As a result, the Court has augmented the factual allegations of the complaint with facts reflected in
entries on the Court's own docket, in Kittery Point's complaint in the state court action, in the Superior Court Order,
and in the Austins' proof of claim in Enright's chapter 7 case.  For current purposes, the Court has not considered
the other documents that were the subject of the parties' requests for judicial notice.  See Fed. R. Civ. P. 12(d).

Kittery Point and Bayview are both limited liability companies.  Enright is an individual.

Enright created Kittery Point in 2005 for the ostensible purpose of facilitating a section 1031

like-kind exchange involving certain real property in Kittery Point, Maine (the "Property").   At

that time, James Austin was the owner of the Property, and Enright was a trusted advisor to

James Austin and his wife, Tudor.  Enright advised the Austins that they could defer their tax

exposure on the Property if they transferred it to an entity for some time.  But, Enright's intent

behind his 1031 proposal was to swindle the Austins.[3]

On March 1, 2005, Kittery Point did not exist as a legal entity.  Nevertheless, on that day,

Enright caused Kittery Point to execute a promissory note in the amount of $600,000 (the

"Note") in favor of Middlebury Equity Partners ("MEP"), an entity that was owned and

controlled by Enright.  Enright also caused Kittery Point to grant a mortgage on the Property to

MEP (the "Mortgage") as security for the Note.  The Note and Mortgage were signed by Daniel

Systo, a handyman for MEP and/or Enright, allegedly in Systo's capacity as a member of Kittery

Point.  The Mortgage contained a covenant and warranty that Kittery Point owned the Property

in fee simple and had good right and title to convey that interest.  However, as noted, the

execution of the Note and Mortgage predated Kittery Point's creation as an entity and – as a

necessary corollary – predated Kittery Point's acquisition of any assets, including any interest in

the Property.  Neither Kittery Point nor the Austins received any consideration in exchange for

the Note and Mortgage.  The Austins were not aware of and did not authorize the Note or the

Mortgage at the time of execution.

---

[3]  Again, these are the allegations in the complaint.  They are not the Court's findings of fact.  Enright has denied
wronging the Austins, and the Court is left with the impression that the complaint does not begin to tell the entire
story of what transpired between Enright and the Austins.

On April 21, 2005, Enright created Kittery Point by filing its certificate of formation with the Delaware Secretary of State.[4]  Six days later, Systo executed an acknowledgement, indicating that the Mortgage was the free act and deed of Kittery Point.  That same day, MEP executed an assignment of the Note and Mortgage (the "Assignment") to Bayview.  Bayview paid MEP hundreds of thousands of dollars for the Note and Mortgage.  Bayview's employee, Steve Gordon, orchestrated Bayview's purchase of the Note and Mortgage, and he received fees and commissions related to that purchase.  Bayview realized a financial benefit when it sold the Note in the secondary market.  Several years later, Gordon entered a guilty plea in a criminal case in Florida admitting to fraud related to thousands of mortgage transactions.

On May 26, 2005, at Enright's urging, James Austin transferred the Property to Kittery Point by a quitclaim deed (the "Austin Deed").  At that time, the Austins were unaware that Kittery Point had previously executed the Note and Mortgage in favor of MEP.  Neither Enright nor MEP ever informed the Austins of the Note, the Mortgage, or the Assignment.

Although the Mortgage, the Assignment, and the Austin Deed all purported to affect title to the Property, none of those documents were promptly recorded.  The Austin Deed was recorded on January 27, 2006, about eight months after it was executed.  The Mortgage was recorded on August 15, 2007, and again on December 10, 2007, more than two years after its execution in March 2005.  The Assignment, executed in April 2005, was also recorded on December 10, 2007.

Kittery Point eventually defaulted on its obligations under the Note and, in 2008, Bayview took steps to foreclose the Mortgage.  Bayview's counsel discovered and advised

---

[4]  The complaint alleges only that Enright created Kittery Point.  It does not state who owned the membership interests in the entity at the time of its formation.  The complaint suggests that Enright owned or controlled all of the membership interests, but stops short of making that allegation.  The pleading also does not allege how the Austins—the current owners of all the membership interests—later came to acquire those interests.

Bayview that Kittery Point did not own the Property when the Note and Mortgage were

executed, and he warned that "there may be a complete failure of title in the mortgage."

Nevertheless, Bayview proceeded with a civil action foreclosure in state court.  Neither Enright

nor Systo, who were in control of Kittery Point at that time, nor any other representative of

Kittery Point appeared to contest the foreclosure.  The Austins first learned of the foreclosure

action on September 29, 2008, after a contractor informed them that Bayview had filed a notice

of foreclosure in the registry.  But, the Austins did not contest the foreclosure proceeding either.

In the absence of a defense, the state court issued a judgment of foreclosure in November 2008.

"Horrified by what had happened on Enright's watch," the Austins took control of Kittery

Point in January 2009.  Compl. ¶ 42.  Bayview informed Tudor Austin that it would sell the

Property at a foreclosure action if she did not cause Kittery Point to execute a document entitled

"Delinquency Repayment Agreement" (the "DRA").  The DRA contained an acknowledgement

that the "Borrower," Kittery Point, had executed the Note, and that the Note was secured by the

Mortgage.  The DRA also contained the following provisions, in a paragraph entitled "Release":

> Borrower, by his/her signature hereon, agrees to the accuracy of the allegations
> contained in this Agreement, as well as to the authenticity and validity of each
> Loan Document referred to herein, and to the validity of the indebtedness
> described within these Loan Documents.  Borrower further agrees and
> acknowledges that there are no defenses, set-offs or counterclaims to the
> indebtedness of Borrower pursuant to the Loan Documents.  The provisions of
> this Agreement are a material inducement for Servicer's agreement to forbear
> from immediately exercising any and all of its remedies upon Borrower's default
> as referred herein and for entering into this Agreement.
>
> Borrower releases Servicer, its subsidiaries, affiliates, agents, officers, and
> employees, from any and all claims, damages or liabilities of any kind existing on
> the date of this Agreement, which are in any way connected with the Loan, the
> servicing of the Loan, or events which led up to or resulted in the Borrower
> entering into this Agreement.  Borrower waives any rights which Borrower may
> have under federal or state statute or common law principle which may provide
> that a general release does not extend to claims which are not known to exist at
> the time of execution . . . .

On February 27, 2009, Tudor Austin executed the DRA on Kittery Point's behalf.  Bayview subsequently dismissed the foreclosure proceedings.  The DRA was never recorded in the registry or filed with the Maine Secretary of State.  After the DRA was executed, Bayview demanded that Kittery Point pay certain sums allegedly due under the Note.

On June 24, 2010, Enright commenced a chapter 7 case in the United States Bankruptcy Court for the District of Vermont.  Several years later, on November 18, 2013, that court denied Enright a discharge under 11 U.S.C. § 727.

Meanwhile, in August 2011, Kittery Point sued Bayview, its servicer, and Systo in state court seeking a declaratory judgment that, among other things, (a) the Note and Mortgage were invalid because they were not supported by any consideration and the allonge to the Note had not been signed by an authorized agent of MEP, and (b) Bayview was not entitled to the funds that Kittery Point paid under the Note because the Assignment had been ineffective.  More than five years later, the state court entered an order granting summary judgment to Bayview (the "Superior Court Order"), concluding that Kittery Point's claims were barred by the releases in the DRA and by Bayview's status as a holder in due course, and that, even if Kittery Point's claims were not barred, Bayview was entitled to judgment as a matter of law in the absence of any evidentiary support for Kittery Point's challenges to the enforceability of the Note.  Kittery Point challenged the Superior Court Order by an appeal to the Maine Law Court.

Kittery Point commenced a chapter 11 case in this Court on June 22, 2017, several days before the date set for oral argument in Kittery Point's appeal.  As of the petition date, the IRS was a creditor of Kittery Point's estate.  Later, this Court granted Bayview relief from stay in the chapter 11 case to permit Kittery Point's appeal to proceed.  That appeal remains pending.

## III. Discussion

### A. Count I: Objection to Claim

In Count I, Kittery Point seeks an order determining that the Note and Mortgage are null

and void, and asks the Court to disallow any claims against Kittery Point, Kittery Point's estate,

or the Property that may be asserted by Bayview or Bayview's affiliates. Kittery Point asserts

that the Note and Mortgage are unenforceable because, "*inter alia*," the Note and Mortgage were

unsupported by consideration and because Kittery Point did not exist when those instruments

were executed. Compl. ¶ 51. Bayview asserts that these attacks on the enforceability of the Note

and Mortgage are barred by the preclusive effect of the Superior Court Order.

The Court looks to Maine law to determine the preclusive effect of the Superior Court

Order. *See* McGarry v. Chew (In re Chew), 496 F.3d 11, 17 n.10 (1st Cir. 2007) (indicating that

federal courts must give state court judgments "the same preclusive effect they would receive in

that state"). Under Maine law, claim preclusion "bars the relitigation of claims if: (1) the same

parties or their privies are involved in both actions; (2) a valid final judgment was entered in the

prior action; and (3) the matters presented for decision in the second action were, or might have

been, litigated in the first action." Wilmington Trust Co. v. Sullivan-Thorne, 2013 ME 94, ¶ 7,

81 A.3d 371 (quotation marks omitted). Generally, a judgment is final for preclusive purposes

despite the pendency of an appeal. *See* Bartlett v. Pullen, 586 A.2d 1263, 1265 (Me. 1991)

(citing the Restatement (Second) of Judgments § 13 cmt. f (1982)); Kane v. Town of Harpswell

(In re Kane), 254 F.3d 325, 328 (1st Cir. 2001) (noting that Maine courts tend to follow the

general approach of the Restatement (Second) of Judgments (1982)).

Kittery Point and Bayview were both parties to the state court action, and the state court

expressly directed the entry of a final judgment as to all claims between Kittery Point and

Bayview.  *See* Me. R. Civ. P. 54(b)(1).  The first and second elements of claim preclusion are satisfied.  To determine whether the third element is also satisfied, the Court considers whether the same "cause of action" at issue here was also presented in state court.  *See* Sullivan-Thorne, 2013 ME 94, ¶ 8, 81 A.3d 371.  Under Maine law, a cause of action is defined through a "transactional test" that examines whether the claims "arose out of the same nucleus of operative facts" and whether those facts constitute a "convenient trial unit."  Id. (quotation marks omitted).  The state law enforceability issues that Kittery Point raises in Count I are plainly founded upon the same group of facts that Kittery Point litigated in state court.  The third element of claim preclusion is also satisfied.  Consequently, to the extent that Count I challenges the enforceability of the Note and Mortgage on the state law theories of lack of consideration and lack of corporate existence, the count will be dismissed under the doctrine of claim preclusion.[5]

### B.  Count II: Avoidance of Mortgage

In Count II, Kittery Point seeks to wield the trustee's avoidance powers as a hypothetical bona fide purchaser under section 544(a)(3).  *See* 11 U.S.C. § 1107(a) (giving the debtor in possession certain rights and powers of a trustee).  Kittery Point asserts that the recordation of the Mortgage would not have provided notice of Bayview's interest in the Property to a hypothetical bona fide purchaser (a) because the Mortgage was executed before Kittery Point existed or owned the Property, and (b) because there were delays in the recording of the Mortgage and the Austin Deed.  Bayview seeks dismissal of Count II on the theory that the doctrine of estoppel by after-acquired property cured these alleged title defects.  Kittery Point believes that doctrine is not a bar to Count II because section 544 trumps equitable and estoppel-

---

[5]  Count I will be dismissed without prejudice to Kittery Point's right to object to Bayview's proof of claim on grounds other than the state law theories of lack of consideration and lack of corporate existence.  Given this disposition of Count I, there is no need to address Bayview's alternative argument that Count I is barred by issue preclusion.

based claims, and the cases that have applied the doctrine did not involve a conveyance

purportedly executed by a non-existent grantor.

The Court's analysis starts with the Code and then pivots to applicable nonbankruptcy

law. Under section 544(a)(3), a debtor in possession "has the status of a bona fide purchaser of

real property who purchased the property in a hypothetical transaction at the commencement of

the bankruptcy case." Stern v. Cont'l Assurance Co. (In re Ryan), 851 F.2d 502, 505 (1st Cir.

1988). A hypothetical bona fide purchaser under section 544(a)(3) is deemed to have conducted

a title search and cannot avoid claims of which he would have constructive notice at state law.

See In re Ryan, 851 F.2d 502 (looking to Vermont law to determine whether a hypothetical bona

fide purchaser in the shoes of a trustee would acquire his interest without constructive or inquiry

notice of a prior interest, and would thus be entitled to priority); see also Collier on Bankruptcy ¶

544.05 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("State law governs who may be a

bona fide purchaser and the rights of such a purchaser for purposes of section 544(a)(3)."). The

question, then, is whether a bona fide purchaser on the petition date would have had been

charged with notice of the Mortgage under Maine law.

Me. Rev. Stat. Ann. tit. 33, § 201 serves as a "race-notice" recording statute, Spickler v.

Ginn, 2012 ME 46, ¶ 10, 40 A.3d 999, that "creates a priority system for competing claims to the

same property[,]" Id. ¶ 9. Section 201 provides, in part, that:

> [n]o conveyance of an estate in fee simple . . . is effectual against any person
> except the grantor, his heirs and devisees, and persons having actual notice
> thereof unless the deed . . . is acknowledged and recorded in the registry of deeds
> within the county where the land lies . . . .

Me. Rev. Stat. Ann. tit. 33, § 201. Under the statute, "when two parties claim the same property,

a subsequent grantee obtains title to the property notwithstanding a prior conveyance" only if the

subsequent grantee "recorded his deed before the first grantee recorded hers." Spickler, 2012

ME 46, ¶ 12, 40 A.3d 999.  The recording of a deed may thus serve as "constructive notice . . . to

after purchasers under the same grantor[,]" preventing a subsequent purchaser from obtaining

title in derogation of the recorded deed.  Westman v. Armitage, 215 A.2d 919, 922 (Me. 1966).

To determine whether a recorded deed should be deemed to provide constructive notice

to a subsequent purchaser, the Maine courts have considered facts that would have been revealed

by a title search conducted in compliance with the Maine Title Standards.  See, e.g., Roberts v.

Frank L. McKinney, Inc., 485 A.2d 647, 650-51 (Me. 1984).  Those standards indicate that a title

search should look back forty years or more when a search begins with a warranty deed.  Maine

State Bar Association, Maine Title Standards, St. No. 201 (3d ed. March 2010).  The standards

provide that "a substantial time lag in recordation by itself" would not put a title searcher on

notice of a title defect.  Id. St. No. 303.  And, the standards state that a title examiner may rely on

the doctrine of "after-acquired title" when a mortgage with a warranty is dated before the

instrument by which the mortgagor acquired title.  Id. St. No. 311.

In Maine, the doctrine of estoppel by after-acquired property generally provides that "if a

grantor purports to convey land that he does not own, but to which he subsequently acquires title,

such grantor's after-acquired title inures to the benefit of the grantee, provided that the

conveyance has been by a full warranty deed."  Deutsche Bank Nat'l Trust Co. v. Wilk, 2013

ME 79, ¶ 19, 76 A.3d 363 (quotation marks omitted).  The grantor's after-acquired title also

inures to the benefit of one to whom the grantee has conveyed the land "with like covenants[.]"

Crocker v. Pierce, 31 Me. 177, 182 (1850).  The grantor:

> having assumed to convey an actual estate, and to make it good in the grantee,
> cannot afterwards acquire and hold that estate against his grantee, nor convey it to
> the detriment of his grantee.  He is bound by his covenant to transfer it to his
> grantee, and the law, as settled in [Maine], to save circuity of action, holds it to be
> thus transferred ex vigore legis, even against a subsequent grantee, where the first
> deed was recorded.

- 12 -

Bennett v. Davis, 38 A. 372, 374 (Me. 1897).  In Maine, where the doctrine of after-acquired title

applies, the grantor's after-acquired title automatically passes to his grantee by operation of law.

Paul C. Creteau, Maine Real Estate Law 195 (1969) (citing, among other things, Pelletier v.

Langlois, 157 A. 577, 578 (Me. 1931), and Baxter v. Bradbury, 20 Me. 260, 263-64 (1841)).[6]

The doctrine has even been said to give "to the grantee of a warrantor an after-acquired title as

against a subsequent innocent purchaser."  Powers v. Patten, 71 Me. 583, 588-89 (1880).

        As applied here, the doctrine of after-acquired title operated to vest title in the Property in

the mortgagee when Kittery Point acquired the Property from James Austin.   This is so, even

though Kittery Point did not exist when the Mortgage was executed.  There is no express

requirement in Maine law that the grantor exist at the time of the initial grant.  Kittery Point

conceded as much at oral argument, and the Court has found no authority to the contrary.

Even so, Kittery Point maintains that an entity is not bound by an act undertaken in its name

before the entity is created, in the absence of some act of ratification or adoption after the entity

is formed.  Kittery Point urges the Court not to view the DRA as an act that validated the Note

and the Mortgage because, by Kittery Point's lights, the DRA can be avoided under the

Bankruptcy Code.  That argument misses the point.  Finding validation of the Note and

Mortgage in the DRA is unnecessary:  the Mortgage itself contains an acknowledgement,

executed on April 27, 2005—six days after Kittery Point was formed—affirming the Mortgage

as "the free act and deed of Kittery Point Partners, LLC."  Compl. Ex. B, at 8.  Through this

acknowledgement, Kittery Point effectively adopted the Mortgage as its own.  See Restatement

(Third) of Agency § 4.04 cmt. c (2006) ("[A] person not in existence at the time of an act or

---

[6] The Maine case law on this doctrine does not appear to support Kittery Point's equitable gloss.  Kittery Point did cite any and the Court did not locate any.

transaction may not subsequently ratify it.  Instead, a person may elect to become bound under

such circumstances by adopting what was done prior to the person's existence.").  Kittery Point

also adopted the Note and Mortgage through the DRA.  Even if Kittery Point could avoid any

transfer effectuated by the DRA, the avoidance would not undo the legal effect of adopting the

Note and Mortgage in the DRA.  For these reasons, Kittery Point cannot now rely upon its lack

of existence at the time that the Note and Mortgage were executed.

In sum, Maine's after-acquired property doctrine is effective to bar claims of the original

grantor and subsequent purchasers, including bona fide purchasers, who would be charged with

constructive notice of the original conveyance.  Here, a bona fide purchaser of the Property on

the petition date would have been charged with constructive notice of the Mortgage from Kittery

Point to MEP and the warranty contained therein.  The later deed to Kittery Point would

therefore operate upon the earlier Mortgage, giving MEP and its assignee, Bayview, the benefit

of the title that Kittery Point received from James Austin.  *See* <u>Wilk</u>, 2013 ME 79, ¶ 19, 76 A.3d

363.  Kittery Point has identified no facial defect in the Mortgage that would render it ineffective

to provide constructive notice of its contents to a hypothetical bona fide purchaser.  Under

Maine's after-acquired property doctrine, Kittery Point's section 544(a)(3) challenge fails as a

matter of law.  *Cf.* <u>Olsen v. Heaver (In re Heaver)</u>, Adv. No. 10-A-96094, 2012 WL 4898461, at

*3 (Bankr. N.D. Ill. Oct. 15, 2012) (granting summary judgment to a trustee on his section 544

claim to avoid a mortgage in the face of an after-acquired title defense where a bona fide

purchaser would not have been charged with constructive notice of the original warranty deed).

Accordingly, Count II will be dismissed.

C.    **Count III: Avoidance of the DRA**

In Count III, Kittery Point seeks to avoid the DRA as a fraudulent transfer under 11

U.S.C. § 548.  Kittery Point asserts that the DRA breathed life into the invalid Note and

Mortgage and therefore resulted in a transfer of Kittery Point's interest in the Property.  Kittery

Point also asserts that, if the releases in the DRA were valid, they effected transfers of Kittery

Point's claims against Bayview related to the Note and Mortgage.  According to Kittery Point,

these transfers should be deemed to have occurred immediately before the petition date because

the DRA was not recorded or otherwise perfected as against a bona fide purchaser.  *See* 11

U.S.C. § 548(d)(1).  Bayview replies that that DRA (a) did not accomplish a transfer within the

meaning of section 548, and (b) is a "private agreement" that either could not have been

perfected against third parties, or was perfected when it was executed in 2009.[7]  Bayview's

motion thus presents two issues with respect to Count III.  The first is whether the complaint

contains sufficient allegations to enable the Court to infer that a transfer occurred within the

meaning of section 548 when Kittery Point executed the DRA.  The second is whether the

complaint plausibly alleges that any such transfer should be deemed to have occurred within two

years before the petition date.

As to the first issue, the Code defines the term "transfer" broadly, to mean:

(A) the creation of a lien;
(B) the retention of title as a security interest;
(C) the foreclosure of a debtor's equity of redemption; or
(D) each mode, direct or indirect, absolute or conditional, voluntary or
involuntary, of disposing of or parting with—
    (i)  property; or
    (ii) an interest in property.

---

[7]  Bayview has not moved to dismiss on the theory that the complaint fails to plausibly plead the elements of constructive fraud set forth in 11 U.S.C. § 548(a)(1)(B).

11 U.S.C. § 101(54).  The DRA did not effect a transfer of Kittery Point's interest in the Property

or result in the creation of a lien on the Property.  Kittery Point's title to the Property was

transferred to Bayview when Kittery Point acquired the Property through the Austin Deed, and

the asserted defect in the Mortgage was cured when Kittery Point acknowledged the Mortgage.

So, when Kittery Point executed the DRA in 2009, that act did not transfer title to the Property to

Bayview, or otherwise create an encumbrance on the Property.  When the DRA was executed in

2009, Kittery Point had an equity of redemption in the Property, and whatever contractual rights

were granted to it in the Mortgage.  There has been no assertion by Kittery Point that the DRA

effected a transfer of its equity of redemption or its other contractual rights.  Kittery Point did not

have any other interests in the Property that could have been transferred in 2009.

The Court assumes, without deciding, that the release of claims in the DRA resulted in a

transfer within the meaning of section 101(54).  With this assumption in place, the question

becomes whether that transfer "was made within 2 years before the date of the filing of the

petition[.]"  *See* 11 U.S.C. § 548(a)(1).  For purposes of section 548:

> a transfer is made when such transfer is so perfected that a bona fide purchaser
> from the debtor against whom applicable law permits such transfer to be perfected
> cannot acquire an interest in the property transferred that is superior to the interest
> in such property of the transferee, but if such transfer is not so perfected before
> the commencement of the case such transfer is made immediately before the date
> of the filing of the petition.

11 U.S.C. § 548(d)(1).  The Code thus pinpoints the occurrence of a section 548 transfer to the

date that transfer becomes valid against a bona fide purchaser under applicable nonbankruptcy

law.  Collier on Bankruptcy ¶ 548.03[3].  The purpose of this provision is to guard the estate

from secret transactions; the timing provision of section 548(d)(1) prevents a transfer from

becoming good against the estate until the transfer could be discovered in the exercise of due

diligence.  Osberg v. Fibison (In re Fibison), 474 B.R. 864, 870 (Bankr. W.D. Wis. 2011).

Kittery Point suggests that the DRA should have been recorded—either with the Maine Secretary of State or in the registry of deeds—and that Bayview's failure to record the DRA amounts to a failure to perfect any transfers that the DRA accomplished. Yet, Kittery Point has failed to identify any principles of Maine law requiring the recordation of a release of claims before that release can be given effect as to third parties. *Cf.* Cadwallader v. Clifton R. Shaw, Inc., 142 A. 580, 583 (Me. 1928) ("When an instrument is not entitled by law to be recorded, placing it on record cannot operate as constructive notice."). The Court is unaware of a recording system for ownership of claims in Maine. In the absence of such a system, anyone interested in the status of Kittery Point's claims against Bayview would have had to make inquiry directly of Kittery Point or Bayview. It is reasonable to assume that such an inquiry, if made, would have brought the DRA to light. As such, the Court concludes that Kittery Point's release of claims became effective against bona fide purchasers when the DRA was executed in 2009. Any transfer caused by the DRA was made more than two years before the petition date. Count III will therefore be dismissed as untimely.

### D.      Count IV: Avoidance of the Note, Mortgage, & the DRA

In Count IV, Kittery Point seeks to avoid the Note, the Mortgage, and the DRA on the theory that it can step into the shoes of the IRS under 11 U.S.C. § 544(b), utilize the ten-year collection period set forth in IRC § 6502(a), and avoid the Note, the Mortgage, and the DRA under IRC § 6901 and Me. Rev. Stat. Ann. tit. 14, § 3576. Bayview seeks dismissal of Count IV on three grounds. First, Bayview contends that section 544 does not permit Kittery Point to step into the IRS's shoes. Doing so, says Bayview, would frustrate, rather than promote, state law. Next, Bayview observes that the Note and the Mortgage were executed more than ten years before the petition date and are therefore insulated from challenge by the IRS. Finally, Bayview

contends that even if Kittery Point could wield the IRS's powers, avoidance would only be

available "to the extent necessary to satisfy the creditor's claim."  Bayview MTD, at 21 (quoting

Me. Rev. Stat. Ann. tit. 14, § 3578(1)(A)).

Before tackling the basic legal theory of Count IV, it is helpful to narrate the factual

allegations germane to that count as a starting point.  As of the petition date, June 22, 2017, the

IRS was a creditor of Kittery Point (although the IRS was not listed on the creditor matrix and its

claim was not included on the schedules).  Almost two months after the filing of Kittery Point's

chapter 11 petition, the IRS assessed penalties against Kittery Point.  Specifically, on August 14,

2017, the IRS assessed penalties for the tax period ending in December 2016.  A few months

later, on October 9, 2017, the IRS assessed penalties for the tax periods ending in 2011, 2012,

2013, 2014, and 2015.  The IRS's proof of claim does not seek to recover for taxes or interest.  In

its proof of claim, the IRS asserts an unsecured claim of $25,350.

Kittery Point's legal theory deserves careful explication.  Under section 544(b), a trustee

can:

> avoid any transfer of an interest of the debtor in property or any obligation
> incurred by the debtor that is voidable under applicable law by a creditor holding
> an unsecured claim that is allowable under section 502 of [Title 11] or that is not
> allowable only under section 502(e) of [Title 11].

11 U.S.C. § 544(b)(1).  The trustee's powers under section 544(b)(1) are derivative; they allow

the trustee to assume the position of an unsecured creditor to recover transfers that creditor

would have been able to avoid but for the bankruptcy.  See Hillen v. City of Many Trees, LLC

(In re CVAH, Inc.), 570 B.R. 816, 823 (Bankr. D. Id. 2017).  Kittery Point alleges that the IRS

was a creditor on the petition date, and looks to IRC §§ 6502 and 6901 as sources of "applicable

law" that can be utilized under section 544.  Next, Kittery Point says that "[t]he liability of a

transferee in collection proceedings [under the IRC] is determined by state law, including the

Maine Uniform Fraudulent Transfer Act[.]"  Compl. ¶ 71.[8]  Finally, Kittery Point asserts that

when that Act "is invoked through . . . § 544(b) . . . then § 550(a) of the Code . . . determines the

scope of the remedy."  Kittery Point Obj. to Bayview MTD, at 17.

For now, the Court assumes that Kittery Point could use the IRS as its "golden creditor"

under section 544.  If Kittery Point were to walk in the IRS's shoes, it would soon founder.

Kittery Point would not benefit from the IRS's collection rights under IRC § 6502 for at least

two reasons.  First, a timely assessment is necessary to trigger the 10-year collection period in

IRC § 6502(a).  Id. ("Where the assessment of any tax imposed by this title has been made

within the period of limitation properly applicable thereto, such tax may be collected by levy or

by a proceeding in court . . . .").  The Internal Revenue Code specifies when an assessment must

be made.  See IRC § 6501(a), (c).  There are insufficient allegations here to determine whether

the IRS's assessments in 2017 were timely.  That deficiency could potentially be cured through

repleading, but there is a more fundamental hurdle at the second step in evaluating Bayview's

substantive liability as Kittery Point's transferee.

If the IRS's assessments against Kittery Point were timely made, section 6502 would

permit the IRS to collect the tax by beginning a proceeding in court, but only if such proceeding

was begun "within 10 years after the assessment of the tax[.]"  IRC § 6502(a)(1).  Here, the

assessments were made in August and October 2017.   So, if the assessments were timely made,

the IRS would have 10 years after the assessments, or until August and October 2027, to collect

the penalties assessed.  During that time, the IRS would have certain rights to assess and collect

from the taxpayer's transferee.  See IRC § 6901(a).  Specifically, the IRS would be empowered

to assess and collect the income tax liability of the taxpayer from a transferee of the taxpayer's

---

[8]  Kittery Point has not asked the Court to consider the Federal Debt Collection Procedures Act, 28 U.S.C. §§
3001-3308, as an alternate source of authority for the avoidance of the Note, the Mortgage, and the DRA.

property "subject to the same . . . limitations as in the case of the taxes with respect to which the liabilities were incurred[.]" Id. Section 6901(a) of the IRC "provides only a procedural remedy against an alleged transferee[,]" while other applicable law determines whether a transferee is liable for a transferor's tax liabilities. Frank Sawyer Trust of May 1992 v. Comm'r of Internal Revenue, 712 F.3d 597, 602-03 (1st Cir. 2013). Here, Kittery Point looks to the Maine Uniform Fraudulent Transfer Act, and specifically section 3576 of that statute, as the state law that determines whether a transfer or obligation may be avoided as fraudulent.

A cause of action under section 3576(1) is barred if not brought "within 6 years after the transfer was made or the obligation was incurred." Me. Rev. Stat. Ann. tit. 14, § 3580(2). To the extent that the Note, the Mortgage, and the DRA (or any of them) effectuated transfers of Kittery Point's assets, those transfers took place more than six years before the filing of Kittery Point's chapter 11 case. Kittery Point does not cite any controlling authority establishing that the IRS can assess a tax (or here, a penalty) after a bankruptcy case is filed, and thereby permit the trustee to look back more than six years prior to the petition date to avoid transfers. The IRS's rights are no more potent in Kittery Point's hands than they are in the IRS's hands. The allegations of the complaint demonstrate that Kittery Point's attempt to avoid the Note, the Mortgage, and the DRA is barred by the applicable statute of limitations. Consequently, Count IV will be dismissed.

### E.    Count V: Declaratory Judgment as to Superior Court Order

Count V seeks a declaratory judgment that the Superior Court Order is "null and void." This count appears to be predicated on the notion that the Superior Court Order lacks legal force and effect because the DRA can be avoided under 11 U.S.C. § 548.

A federal court has discretion to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, in certain circumstances. *See* El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992). For multiple reasons, the prayer for relief in Count V does not present an appropriate circumstance. First, respect for the decisions of the Maine state courts militates strongly against a declaration that the Superior Court Order is "null and void." Second, there is no need for this type of frontal assault on a decision of another court. Kittery Point seeks relief under certain parts of the Bankruptcy Code. There is, however, no suggestion that Kittery Point's entitlement to relief under the Bankruptcy Code depends on a declaration that the Superior Court Order is "null and void." Finally, at the hearing on the Motion to Dismiss, Kittery Point conceded that this count sought relief duplicative of the other counts in the complaint. For these reasons, this count will be dismissed.

### F.    Count VI: Fraud

Count VI is based on fraud under Maine common law. Kittery Point consents to dismissal of this count as to Bayview. That leaves the fraud count intact as to Enright, who seeks dismissal on the grounds that the complaint fails to state a claim for fraud against him, and that any such claim would be barred by the statute of limitations.

Under Maine law, an action for fraud will lie where the defendant:

(1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

Drilling & Blasting Rock Specialists, Inc. v. Rheaume, 2016 ME 131, ¶ 17, 147 A.3d 824 (quotation marks omitted). As noted above, a party alleging fraud "must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "The particularity requirement

means that a complaint must specify the time, place, and content of an alleged false

representation.  Conclusory allegations and references to plans and schemes are not sufficient."

U.S. ex. rel. Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 13 (1st Cir. 2016) (quotation marks

omitted) (citations omitted).

In the Court's estimation, Kittery Point's fraud claims against Enright are premised upon

allegations that (a) Enright told the Austins that they could obtain a tax advantage by transferring

the Property to an entity; (b) Enright caused Kittery Point to execute the Note and Mortgage on

the Property in favor of his entity, MEP, and did so without informing the Austins or causing

either the Austins or Kittery Point to receive any consideration for those instruments; (c) MEP

assigned the Mortgage to Bayview in exchange for hundreds of thousands of dollars, without

informing the Austins of the assignment; (d) Enright persuaded James Austin to transfer the

Property to Kittery Point, without informing him of the Note and Mortgage; and (e) Enright,

while in control of Kittery Point, failed to make payments under the Note and failed to contest

Bayview's foreclosure of the Mortgage.  Compl. ¶¶ 11, 13, 15, 16, 18, 26, 29, 30, 34, 35, 39.

The only representation alleged is that Enright told *the Austins* that they could obtain a tax

advantage by transferring the property to an entity.  There is no allegation that Enright made any

false representations to *Kittery Point*, the only plaintiff in this proceeding.  Further, even if the

Court could infer that Enright made false representations to Kittery Point related to the Note, the

Mortgage, or the Assignment, there are no allegations of the time, place, or content of any such

false representations.  Kittery Point has failed to plead its fraud claims against Enright with

particularity.  As a result, Count IV will be dismissed without prejudice.  *See* Wright & Miller,

5A Fed. Prac. & Proc. Civ. § 1300 (3d ed.) (explaining that when a pleading is deemed deficient

under Rule 9(b), the pleader is ordinarily granted leave to amend under the liberal amendment

provisions of Fed. R. Civ. P. 15, unless it appears that an amendment would be futile).[9]

### G.    Count VII: Conspiracy to Violate and Violations of RICO

In Count VII, Kittery Point seeks relief against Enright and Bayview for alleged

violations of, and conspiracy to violate, the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. §§ 1961-1968.  Enright and Bayview each challenge this count by asserting the

expiration of the applicable limitations period.  Kittery Point counters that the limitations period

was tolled by fraudulent concealment.  Enright also contends that dismissal of Count VII is

warranted because Kittery Point has failed to plead the predicate acts of mail and wire fraud with

the requisite degree of particularity.  Enright's particularity argument finds some traction, as

does Bayview's limitations defense.

The complaint fails to plead the predicate acts that provide the basis for Kittery Point's

RICO claims with the requisite degree of particularity.  To unpack this conclusion, the Court

begins with the language of the relevant statute.  Although the complaint does not identify the

statutory predicates for Count VII, the Court presumes that the operative section for the alleged

RICO violations is section 1962(c), which provides that:

> [i]t shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct of

---

[9]  If Kittery Point files a further amended complaint, it must allege, with specificity, when Kittery Point first learned that Enright was denied a discharge.  The filing of Enright's chapter 7 case in June 2010 tolled the statute of limitations on Kittery Point's fraud claims against him.  *See* 11 U.S.C. § 108(c).  This is true whether the six-year statute of limitations began running in 2005, as Enright contends, or in 2009, as Kittery Point concedes.  When the tolling ended—and the statute of limitations began running again—is less clear.  Under section 108(c), the tolling ended "30 days after notice of the termination or expiration of the stay under section 362 . . . with respect to" Kittery Point's claim against Enright.  11 U.S.C. § 108(c)(2).  The stay terminated with respect to claims against Enright when he was denied a discharge in November 2013.  *See* 11 U.S.C. § 362(c)(2)(C).  The current pleading only alleges that Enright was denied a discharge.  It fails to identify when Kittery Point first learned this fact.  In the circumstances of this adversary proceeding, the plaintiff should not be allowed to omit facts that are directly relevant to an obvious affirmative defense, particularly when those facts are known to the plaintiff.

such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  To state a claim under section 1962(c), a plaintiff must allege "(1) conduct

(2) of an enterprise (3) through a pattern (4) of racketeering activity."  Feinstein v. Resolution

Trust Corp., 942 F.2d 34, 41 (1st Cir. 1991) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S.

479, 496 (1985)).  To make out a pattern of racketeering activity, a complaint must allege several

things.  First, the complaint must allege "that each defendant committed two acts of racketeering

activity within the span of ten years."  Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546,

1560 (1st Cir. 1994).  Second, the complaint must also allege that those acts are related and

"amounted to, or posed a threat of, continued criminal activity."  Feinsten, 942 F.2d at 45

(quotation marks omitted).  The predicate acts of racketeering activity include mail fraud and

wire fraud.  18 U.S.C. § 1961(1).  "The elements of a mail fraud violation are a scheme to

defraud and the use of the mails to execute or further this scheme."  P & B Autobody, 43 F.3d at

1560.  And, the elements of a wire fraud violation are: (1) a scheme to defraud, (2) the

defendant's knowing and willing participation in the scheme with the intent to defraud, and (3)

the use of the interstate wires in furtherance of the scheme.  Sanchez v. Triple-S Mgmt., Corp.,

492 F.3d 1, 9-10 (1st Cir. 2007).  The heightened pleading standard of Rule 9(b) applies to

pleading predicate acts of mail and wire fraud.  Feinstein, 942 F.2d at 42.

    Here, the only allegation of predicate acts consists of the following statement:

    Enright, Gordon and Bayview have utilized the U.S. mail, telephone and email as
    instruments of the above described scheme and as instruments in the continuing
    fraud upon the Debtor.

Compl. ¶ 98.  There are no allegations of when or where Enright used the mail or interstate wires

in furtherance of the alleged scheme, or of the content of those alleged communications.  "It is

not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial." Feinstein, 942 F.2d at 42.

The question then becomes whether this pleading deficiency warrants dismissal as to Enright with or without prejudice. A RICO mail and wire fraud case is not subject to automatic dismissal upon a determination that Rule 9(b) was not satisfied. New England Data Servs., Inc. v. Becher, 829 F.2d 286, 290 (1st Cir. 1987). If the allegations of the complaint sketch out a scheme to defraud, and imply that a defendant used interstate communication facilities in that scheme in a manner unknown to the plaintiff, then the plaintiff may be entitled to some discovery and an opportunity to amend the complaint. Id. at 290-92.

Here, the complaint alleges that Enright was engaged in a scheme to defraud Kittery Point, and that Enright used interstate communication facilities in that scheme. However, it appears that Kittery Point was itself engaged in some of the relevant communications, such that it should be charged with knowledge of the time, place, and content of at least some of the alleged instances of mail and wire fraud. On one hand, Kittery Point's apparent involvement in the transactions weighs in favor of a dismissal with prejudice. On the other hand, the liberal policy of permitting amendments and trying cases on their merits weighs in favor of a dismissal without prejudice. When that liberal policy meets Kittery Point's suggestion that it is now in possession of information obtained in discovery in the state court action and is thus positioned to replead Count VII with particularity, it seems best to permit Kittery Point to use that state court

discovery to amend Count VII as to Enright.  Count VII will therefore be dismissed as to Enright

without prejudice.[10]

As to Bayview, the four-year period of limitations is an insuperable bar to Count VII.

The Supreme Court has held that the four-year statute of limitations of the Clayton Act, governs

the timeliness of civil RICO claims.  *See* Agency Holding Corp. v. Malley-Duff & Assoc., 483

U.S. 143, 156 (1987).  That statute of limitations does not begin running on a date determined

through use of the so-called "last predicate act" rule, Klehr v. A.O. Smith Corp., 521 U.S. 179,

186-87 (1997), or the "injury and pattern discovery" rule, Rotella v. Wood, 528 U.S. 549, 555-60

(2000).  In the First Circuit, the limitations period on a civil RICO claim begins to run when the

plaintiff discovers or should have discovered the alleged injury.  Lares Grp., II v. Tobin, 221

F.3d 41, 44 (1st Cir. 2000).  Although the limitations period may be tolled under the doctrine of

fraudulent concealment, a plaintiff must exercise reasonable diligence to discover its claims

before invoking that doctrine.  Klehr, 521 U.S. at 194-96.

The complaint clearly shows that the four-year statute of limitations began running as to

Bayview in 2011 at the latest, and was not thereafter tolled.  Kittery Point began litigating with

Bayview in state court in 2011.  That litigation focused on the very same common nucleus of

operative facts that are the focus of this adversary proceeding.  When Kittery Point sued

Bayview on those facts in 2011, it knew or should have known of the factual basis for its RICO

claims against Bayview.  The complaint establishes that the four-year limitations period expired

---

[10] Enright also urges dismissal of Count VII on the grounds that Kittery Point has failed to plead the continuity element of the alleged RICO violation, and that the claim is barred by the statute of limitations.  For now, the Court reserves judgment on the continuity element and declines to dismiss Count VII as to Enright on statute of limitations grounds.  Based on the allegations of the complaint, Kittery Point knew or should have known about the factual basis for its RICO claims against Enright no later than January 2009.  However, as previously discussed, the time for bringing claims against Enright was tolled from the date that he filed his chapter 7 petition until the date that Kittery Point received notice that the stay had terminated in Enright's case.  *See* 11 U.S.C. § 108(c).  The complaint does not indicate when Kittery Point received notice of the denial of Enright's discharge.  If Kittery Point amends its RICO claims against Enright, that amended pleading must specify when Kittery Point first learned that Enright was denied a discharge.

as to Bayview in 2015, at the latest.  There is no indication that, if given leave to amend, Kittery

Point might be able to state a RICO claim against Bayview that is not barred by the statute of

limitations.  Count VII will therefore be dismissed as to Bayview with prejudice.

### H.   Count VIII: Turnover of Property of the Estate

In Count VIII, Kittery Point asserts that it made payments to Bayview "for no

consideration, pursuant to the Note and Mortgage, which are and were at all times null and void,

and those funds constitute property of Kittery Point's estate." Compl. ¶ 102.  In its prayer for

relief, Kittery Point asks the Court to enter an order "compelling the turnover of all funds

paid . . . to Bayview" and "compelling turnover of the Note and Mortgage[.]"  Bayview seeks

dismissal of Count VIII on the theory that the requested relief is barred by principles of res

judicata, and that the count otherwise fails to state a claim.

Although the complaint does not identify any statutory foundation for Count VIII, the

Court assumes that this count is premised upon 11 U.S.C. § 542, which generally deals with

turnover of property of the estate.  Section 542 only applies to property of the estate; it does not

apply to property that has been fraudulently transferred before the petition date "because such

property does not become property of the estate until it has been recovered by the estate."

Collier on Bankruptcy ¶ 542.03[2] (citing Spradlin v. Khouri (In re Bruner), 561 B.R. 397, 404-

05 (B.A.P. 6th Cir. 2017); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 325 B.R. 134,

137 (Bankr. S.D.N.Y. 2005)).  In other words, section 542 is not a substitute for an avoidance

action.  See Bank of Am., N.A. v. Veluchamy (In re Veluchamy), 879 F.3d 808, 818 (7th Cir.

2018).  Here, there can be no serious dispute that Kittery Point's resort to section 542 is

inappropriate because any payments made under the Note and Mortgage would only become

property of the estate upon avoidance of the Note and Mortgage.  Count VIII will therefore be

dismissed for failure to state a claim.

### I.    Other Issues

Bayview's motion additionally seeks mandatory or discretionary abstention with respects

to Counts I, VI, and VIII.  There is no need to consider Bayview's request with respect to Counts

VI or VIII because both of those counts will be dismissed as to Bayview.  The last count for

which Bayview seeks abstention is Count I, the objection to claim.  Although that count will also

be dismissed, that dismissal is without prejudice to Kittery Point's ability to contest Bayview's

claim on grounds other than the state law theories of lack of consideration and lack of corporate

existence.  To the extent that Count I is resurrected in the future, the Court will not abstain from

determining it.  Properly viewed, an objection to claim under 11 U.S.C. § 502 is a core matter

that should not, and indeed cannot, be determined in some other forum.

Enright's motion to dismiss also contains an alternative basis for dismissal of the two

counts asserted against him: he also seeks dismissal under Fed. R. Civ. P. 12(b)(5) due to

insufficient service of the summons and complaint.  Specifically, Enright contends that the

original summons to him was deposited in the mail 12 days after it was issued, in violation of the

seven-day deposit requirement of Fed. R. Bankr. P. 7004(e).  Enright concedes that Rule 7004(e)

provides a remedy short of dismissal—*i.e.*, the issuance of another summons—if the original

summons is not deposited in the mail within seven days after it is issued.  *See* <u>id.</u>  However, he

urges the Court not to consider the curative effects of remedial service because he believes that

the complaint "is fatally flawed and must be dismissed with prejudice[.]"  Enright MTD ¶ 35.

The Court will not dismiss the counts against Enright under Rule 12(b)(5).  Kittery Point did

engage in remedial service on Enright in December 2017, after Enright filed his motion to

dismiss.  More fundamentally, the Court cannot conclude at this point that the deficiencies in the Kittery Point's claims against Enright are irreparable.

**J.** **Conclusion**

A separate order will issue memorializing the Court's disposition of the motions to dismiss and establishing certain procedures for further activity in this proceeding.